Filing # 176091561 E-Filed 06/26/2023 10:24:32 AM

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI DADE COUNTY, FLORIDA

TIMOTHY OLIVER,

          Plaintiff,

v.

CASE NO.:  2023-018703-CA-01

UNIVERSITY OF MIAMI.,

          Defendant.
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, Timothy Oliver, by and through his undersigned counsel, sues the defendant University of Miami., and in support thereof, alleges as follows:

1. This is an action for damages in an amount in excess of Fifty Thousand ($50,000.00) Dollars.

2. At all times material hereto, plaintiff, Timothy Oliver (hereinafter "Mr. Oliver or Plaintiff"), is a resident of Miami-Dade County, Florida. He is African-American.

3. At all times material hereto, defendant University of Miami, (hereinafter referred to as "Defendant"), is a not-for-profit corporation entity existing by virtue of the laws of the State of Florida and conducts a significant amount of business in the State of Florida, with its principal offices in the State of Florida.

4. All relevant acts complained of herein occurred within Dade County Florida.

5. Jurisdiction over the Defendant is predicated upon F.S. 48.193 (1)(b) a and g which provides that a "person, whether or not a citizen or a resident of this state, who personally or through an agent does any of the acts enumerated in this subsection

1

thereby submits that person. . . to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following:

    g)    "Breaching a contract in this State..."

6. Defendant University of Miami, by and through its agents, breached an implied contract in the State of Florida, hereinafter more specifically described.

7. Plaintiff enrolled in the Frost School of Music doctoral program in August 24, 2020 with defendant.

8. There is an implied contract in fact between plaintiff and defendant. The implied contract was based on the terms and conditions for graduation that were offered by the defendant at the time of enrollment. (Exhibit "A")

9. The Academic and Graduate Bulletin states in relevant part as follows:

> "It is the policy of the University of Miami that no person within the jurisdiction thereof shall, on the basis of race, religion/creed, color, sex, age, disability, sexual orientation, gender identity or expression, veterans status, national origin, or citizenship status be excluded from, participation in, be denied the benefits of, or be subjected to discrimination or harassment (including all forms of sexual harassment and sexual violence) under any program or activity of the University, regardless of whether such program or activity occurs on-campus or off-campus." See Exhibit "A"

10. Defendant breached its own terms and conditions set forth for graduation acted arbitrarily and capriciously, irrationally, and in bad faith toward plaintiff while he was enrolled at defendant as set forth below.

11. When Plaintiff enrolled in the University of Miami, Frost School of Music, on August 24, 2020 for the Fall 2020/Spring 2021 academic year, the Doctoral Program within the Department of Vocal Performance consisted of five individuals: three of whom were returning students from the previous year and the remaining two students were

newly admitted. The racial demographic of each of these students consisted of one white male, two white females, one Chinese female and Plaintiff, the sole African American. All other doctoral students were non-black.

12. Upon returning for his second academic year, that is, Fall 2021/Spring 2022, the doctoral program within the Department of Vocal Performance at the Frost School of Music consisted of seven individuals: four of whom were returning students from the previous year, and the remaining three students were newly admitted. The racial demographic of each of these students consisted of one white male, one white female, three Chinese females, one Chinese male, and the Plaintiff. Once again, the Plaintiff was the sole African American in the Doctoral Program in the Department of Vocal Performance in both years that Plaintiff was enrolled in the University of Miami's Frost School of Music.

13. In approximately February 2021, the seven members of the voice faculty collectively make the choice to award TA (Teaching Assistant) positions which provide a tuition waiver plus stipend to graduate students. Two of the three returning graduate students who applied for a TA were not TA's in the 2020-2021 academic year were TA's in the 2021-2022 year: Olivia Rich (Caucasian) and Leah Torres,(Hispanic). Mr. Oliver was the only one of the returning graduate students (Who expressed interest in a TA) not given the TA position. Upon information and belief, it was based on Mr. Oliver's race since the Defendant failed to articulate a legitimate reason for him not being given a TA position.

14. In August of 2020, Mr. Oliver had a virtual Zoom meeting with his Academic Adviser, Professor Alan Johnson, prior to registering for classes for his first semester at the

University of Miami, who advised him of what classes he would need to take to stay on a timely track to graduate. Following the meeting, Mr. Oliver came up with the schedule based on the meeting. Per his approval, Mr. Oliver registered for classes, one of which included MTC 717: Music Theory Analytical Techniques. Thereafter, in February 2021, Mr. Oliver was in conversation with the other doctoral students in the program during that time. He asked them about their experiences with music theory because he received a B- in the course and not a B. Each one of them told Mr. Oliver that they were advised by Alan Johnson to take a different theory class called MTC 711: Music Theory Pedagogy, a far less vigorous course. Additionally, each one of them passed the course with the grade of an A. In May of 2021, Mr. Oliver reported this information to Dr. de l'Etoile, the Associate Dean of Graduate Studies that he felt that this may have been discriminatory.

15. On August 23rd, 2021, Mr. Oliver enrolled in a Pass/Fail 0-Credit Hour course called MVP8: Voice Forum. The class is designed to allow vocal performance students an opportunity to perform the musical repertoire they study throughout the semester in front of an audience of students, faculty, and staff, and meets every Friday from 2:15pm-3:05pm. Because of the large number of vocal music students in the program, the weekly performances that occur each Friday afternoon are scheduled in groups of approximately 8 students, as the 50-minute class time interval only allows 8 students to sing one of their pieces before the audience. The entire vocal performance student body was divided into 6 groups of approximately 8 students in each of the 6 groups which are scheduled based on class (Freshman, Sophomores, Juniors/Seniors etc.). These groups were scheduled to sing on various Fridays throughout the semester.

16. Mr. Oliver noticed that the first group of students who were scheduled to sing on Friday September 3rd, in the first Voice Forum performance of the semester were labeled as "Group 1: Veterans." This group contained all the names of the returning graduate students from the previous year, both Master and Doctorate, except Mr. Oliver. However, with the second group of students scheduled to sing on the following Friday, September 10th, labeled as "Group 2: New Grads," Mr. Oliver found his name, "Timothy Oliver" on this list of incoming graduate students, who were beginning their first year of school at Frost. Of the 4 returning doctoral students in the Voice program, as well as the 3 newly admitted doctoral students, Plaintiff was the only one miscategorized, being the sole African American in the doctoral program of the Vocal Performance program.)

17. Mr. Oliver should have been placed on the same list as all the other returning graduate students, Group 1. Somehow, in the entire department of Vocal Performance, all of the students were categorized correctly, but Mr. Oliver was the only student who was on the wrong list and sang with the new students. Upon information and belief, Plaintiff was subjected to disparate treatment due to his race.

18. At the end of each semester, all undergraduate and graduate Vocal Performance students are required to perform a final jury. A final jury is a performance of 4-8 musical selections, depending on the year of the student, that each student works on throughout the semester with their assigned faculty voice professor, that takes place in front of a panel of all 7 of the voice professors. During this jury, students are graded on memorization of pieces, artistry, musical expression, and technical development. Typically, all voice students are asked to sign up for a 10-minute jury time, that ranges

from approximately 9:30 am to 6:00 pm, approximately one and half weeks before the scheduled date of juries, which in the Fall 2021 semester, took place on Friday December 10, 2021.

19. On Wednesday December 1, 2021, Mr. Oliver texted his voice teacher, Dr. Moore, asking if she knew when juries were scheduled because he had not received any information regarding Fall 2021 juries as he had this time last year. She responded by saying, "Weird, there have been a number of emails that have gone out from Dr. Ragsdale, the Department Chair," and suggested Mr. Oliver reach out to him for information.

20. Mr. Oliver then emailed Dr. Ragsdale stating that all semester long, he had not been included on his Department of Vocal Performance listserv, where important emails regarding announcements, professional audition opportunities, and most importantly, end-of-semester jury sign-up information is sent to the students.

21. Dr. Ragsdale responded to Mr. Oliver's email and forwarded him the information to sign up for a jury. Since Mr. Oliver was the last one to sign up due to not receiving the email regarding juries, Mr. Oliver was initially stuck with a 9:27 am slot, which is not an ideal time for singing high notes.

22. Mr. Oliver was eventually able to move that time and was able to sing at the end of the allotted jury times, instead of at the beginning, because all the other times were taken. Mr. Oliver agreed to sing at 5:57 pm, which was the last time slot, because it is much easier to sing in the evening than in the morning.

23. However, since all the other jury sign-up times had been taken, that meant that Mr. Oliver was the only one who was left off of the Vocal Performance Student listserv

email list, despite having been told by him initially that he was not the only one whom that had happened to, which is why the only two options for his jury times were either at the beginning or the end of the list of times allotted.

24. A final jury is a performance of 4-8 musical selections that each student works on throughout the semester with their assigned faculty voice professor, which takes place in front of a panel of all seven voice professors.

25. During this jury, students are graded on memorization of pieces, artistry, musical expression, and technical development.

26. Additionally, Doctoral students are required to sing a specific jury called the Doctoral Qualifying Jury as the first step in the Doctoral Qualifying Process.

27. Per the Doctoral Qualifying Process, before performing the jury before the Department of Vocal Performance Faculty, doctoral students are required to submit written program notes to the Voice Faculty, which are descriptive notes that summarize the pieces they will sing at the time of the jury. Subsequently, program notes are orally defended before the Voice Faculty to demonstrate the knowledge of the music.

28. On December 3, 2021, Mr. Oliver submitted program notes to the Vocal Performance Faculty a week before singing his Fall 2021 attempt at the DQJ.

29. Less than three hours later, Mr. Oliver submitted revised program notes to the faculty because, during that 3-hour time frame, he had a thirty-minute vocal coaching session with Professor Johnson.

30. Professor Johnson's feedback to Mr. Oliver was that he should maintain the scholarly writing which discusses each piece's historical and musical elements but should also

include something about how the music affects Mr. Oliver emotionally and inspires him.

31. Relying on Professor Johnson's counsel, Mr. Oliver added to each of the selections of his Fall 2021 program notes. He sent the revised document to the MVP faculty approximately three hours after the first document was sent.

32. Mr. Oliver proceeded to orally defend his program notes at the time of his jury in December one week later. He passed his oral examination of the written program notes.

33. Per the policy describing the Doctoral Qualifying Jury (DQJ): The policy states that in regard to the Oral Defense of the Program Notes, only two possible outcomes will be given: Pass or Fail. If Professor Johnson, or any of the other faculty members on the committee did not feel that Mr. Oliver's Program Notes were not at the doctoral level in December 2021, per the policy, they should have stated that at the time of the defense. However, Mr. Oliver passed the Oral Defense in December and no professor made any mention about the lack of quality of Mr. Oliver's program notes at that time, but instead, gave him a passing grade.

34. Mr. Oliver complained about discriminatory treatment in December 2021. The complaints dealt with several incidents regarding unequal treatment set forth above. The school conducted an investigation treating the complaints as discrimination based on race and religion.

35. On February 10, 2022, the Frost School forwarded the complaint to the Office of Diversity, Equity and Inclusion after Plaintiff complained in December 2021, who concluded that Mr. Oliver's complaints based on race and religion were unsubstantiated.

8

36. Subsequently, on Friday, May 6, 2022, Mr. Oliver orally defended his program notes for the end-of-semester Doctoral Qualifying Jury.

37. Once again, the policy states that only two outcomes are given at the time of the Oral Defense of the Program Notes: Pass or Fail. The beginning of Dr. Ragsdale's grade decision letter states that the faculty unanimously voted not to pass Mr. Oliver.

38. Furthermore, the faculty were already informed by Dean Prado the year prior that giving ambiguous responses to Mr. Oliver's Doctoral Qualifying Jury such as the option provided in May 2022 to revise the program notes if he passed the singing portion of the DQJ are not permitted but that the policy would need to be followed in exactness, which is why he granted his appeal the year before. He stated that since it was not clearly articulated that Mr. Oliver did not pass or fail the Program Notes portion of the jury, Mr. Oliver's appeal was granted. So, only two outcomes could be possible in any subsequent attempt at the qualifying jury: Passing or Failing. Mr. Oliver passed in December 2021, and failed in May 2022.

39. The Spring 2022 program notes incorporated the advice previously given to Mr. Oliver by Professor Johnson in December 2021, specifically including the inspirational elements to the descriptive notes, following the notes' scholarly portion.

40. However, after the exam, deliberation took place in the Department of Vocal Performance without Mr. Oliver in the room. After the deliberation, Mr. Oliver was invited to reenter the room, where the Voice Faculty informed him that he did not pass his oral defense of the program notes.

41. Thereafter, Dr. Ragsdale, the Department of Vocal Performance Chair, emailed Mr. Oliver that he had failed his exam. The email stated in pertinent part:

> "Scholarly – As you remember, this is the primary concern of the faulty. Scholarly writing should not contain first-person point of view or personal references about your feelings."

42. Here, the MVP faculty unanimously failed the Oral Defense portion of Mr. Oliver's DQJ due to incorporating inspirational elements. This is the same reason that Professor Johnson gave Mr. Oliver what to incorporate into his notes.

43. The failing grade on May 6, 2022, occurred after the February 2022 Department of Vocal Performance Faculty investigation regarding discrimination concerns concluded. This reflects an obvious act of retaliation by the Frost School.

44. On September 16, 2021, Plaintiff's voice lessons teacher, and DQJ committee member, Dr. Stephanie Moore, stated that it was very irregular to be experiencing ongoing nasal congestion for several weeks with no progression towards recovering. She suggested he reach out to a doctor to see if medical treatment would help my singing within weekly lessons. Per her suggestion, Mr. Oliver reached out to the Ear, Nose & Throat Department at the University of Miami Lennar Medical Center the same day to schedule an appointment and copied her in the email confirming his appointment so she would know that Mr. Oliver made the effort to rectify the problem that was making it difficult for her to teach him effectively in weekly voice lessons. Mr. Oliver was first seen on September 28, 2021, when his doctor confirmed he had inflamed nasal polyps, obstructing his ability to breathe through his nose. Therefore, Mr. Oliver was unable to do nasal exercises with his voice teacher in weekly lessons, which helps to solve intonation problems within singing technique.

45. Then, on February 4, 2022, Mr. Oliver began phase two of the University of Miami's formal grade appeals process regarding his DQJ, after being formally dismissed from

the program in December 2021. This process begins with the Department of Vocal Performance level, may escalade to the School of Music level, and end at The Graduate School. At that time, he received the procedure from the Graduate Studies Office of the Frost School of Music with information detailing the process of appealing a grade or academic outcome based on a medical condition or disability. After thoroughly reading the information, Mr. Oliver submitted a letter in writing detailing a medical condition he had, which affected his ability to learn, that was accompanied by an official doctor's summary of his visit. After being made aware of his condition which made it difficult for him to sing, and properly learn in his voice lessons and vocal coaching classes, the Frost School of Music did not overturn the Vocal Performance Department's decision to exclude him from the school by dismissing him from the program. Instead, on February 24, 2022, he received an official letter, signed by Dr. de l'Etoile, the Associate Dean of the Graduate Studies Office, indicating that the Frost School of Music upheld the decision of the Department of Vocal Performance to dismiss him from the Vocal Performance program.

46. Mr. Oliver proceeded to have nasal polyp removal surgery at the University of Miami Lennar Hospital on April 29, 2022, showing the medical condition he noted to the Frost School Administration was a serious one.

47. Despite the fact that plaintiff met the academic and clinical performance regarding defendant's academic requirements, the defendant acting arbitrarily and capriciously, irrational, in bad faith, by claiming that he did not meet said requirements when he was in fact meeting the requirements of the program.

48. The Defendant breached the Academic and Graduate Bulletin by violating its own policy that states "It is the policy of the University of Miami that no person within the jurisdiction thereof shall, on the basis of race, religion/creed, color, sex, age, disability, sexual orientation, gender identity or expression, veterans status, national origin, or citizenship status be excluded from, participation in, be denied the benefits of, or be subjected to discrimination or harassment (including all forms of sexual harassment and sexual violence) under any program or activity of the University, regardless of whether such program or activity occurs on-campus or off-campus." See Exhibit "A"
49. Also, implied in that policy is to not retaliate against a student that complains about discrimination.
50. The Defendant changed the policy from the Fall 2021 to the Spring 2022. Upon information and belief, the change in the policy was only applied to Plaintiff. Thereafter, the policy was changed back to what the policy was in the Fall 2021.
51. The change directly caused Plaintiff to fail and be dismissed from the Frost School.

What Determines Passing and Failing

52. The DQJ consists of two components: a written component and a singing component. The reason for the letter of dismissal Plaintiff received in December 2021 was because the panel determined that he failed the singing portion of the DQJ, not the written portion. Additionally, the reason Plaintiff was invited to come back after being dismissed is because he appealed the decision not to pass his DQJ in December 2021.
53. It was determined that according to policy, a student cannot fail the singing portion of the DQJ, only the written portion. Thus, since the written portion was passed, Plaintiff did not end up failing the DQJ.

54. Additionally, Plaintiff attempted to appeal the singing portion of the exam with the School of Music based on a verified medical condition, but Plaintiff's appeal was denied by the Frost School and partially granted by The Graduate School, which is the governing body of all graduate programs at the University of Miami, in that he was able to return to the University of Miami, Frost School of Music in January 2022 for the Spring 2022 semester.

55. Thereafter, Plainitff was given another opportunity to write and sing the exam again at the end of the term in May 2022.

56. Reasons for concerns for Retaliation

57. The written portion of the DQJ incorporated the use of personal elements that Mr. Oliver was previously encouraged to incorporate the semester prior, by a member of the committee who grades the exams, and passed that portion of the exam. Again, the oral defense of the written program notes was never in question.

58. Due to discrimination and retaliation, the elements that were advised by the Professor in the Fall 2021 attempt have yielded a different result in Spring 2022 as set forth below.

59. In January of 2022, several weeks after the December 2021 DQJ, Plaintiff appealed the decision of the failing sighting very specific points that were not within the policy. The following day, the Associate Dean of Graduate Studies sent a letter of dismissal containing a hyperlink to the Department of Vocal Performance policy, which had changed each point of the policy.

60. Plaintiff brought up in his letter of appeal that the DQJ took place in December 2021, and the letter of dismissal was given over a month later. No communication was made that the policy was changed.

61. In fact, when Plaintiff queried Dr. de l'Etoile, the Associate Dean of Graduate Studies, she informed him via email that no communication was made to any of the students in the graduate program.

62. While the appeal of the December 2021 DQJ was partially granted, the Department used this revised, illegitimate policy to not only fail his final May 2022 attempt of the DQJ, but also to tell him that he was not permitted to sing certain special topic repertoire should he proceed to sing a recital, which is the next step of the Doctoral Qualifying Process for students who pass the DQJ.

63. Plaintiff was the only one held to the standards of this policy.

64. After Mr. Oliver was formally dismissed from the program, the policy was changed back to its original state, and did not reflect the changes that were made up on the spot regarding what determines a passing/failing grade, and what students are allowed or not allowed to sing in recitals.

65. Thus, the biggest change is that it allowed the school to fail Mr. Oliver based on the singing portion, and not solely on the written portion as the original policy did.

66. Also, it is also important to note that regarding the second policy that Plaintiff was given changed with no explanation or communication of the change.

67. Plaintiff was the only one in the program graded on that new policy in Spring 2022 because no other student took the Doctoral Qualifying Jury exam in the spring 2022 semester. All of the other doctoral students were passed in the Fall (December 2021.)

68. As such, the very act of creating a new policy solely for his May 2022 jury, and failing him in that examination for the very reasons the faculty encouraged me to incorporate the semester prior, is in and of itself an act of discrimination and retaliation because Mr. Oliver was the only one graded on that policy and no one else was and because Mr. Oliver was failed on the very grounds he was encouraged to incorporate the semester prior.

69. Further, after Plaintiff was dismissed they changed the policy back to the original one.

70. As a result of the forgoing, defendant breached the implied contract with plaintiff resulting in plaintiff being dismissed from the program and not graduating due to his race and retaliation.

71. As a result of the forgoing, the defendant breached the implied contract with plaintiff, resulting in plaintiff not being conferred a degree from the program and being damaged in amount in excess of Fifty Thousand Dollars ($50,000.000).

72. Plaintiff has exhausted all internal administrative remedies and has satisfied all conditions precedent prior to commencement of this suit.

WHEREFORE, plaintiff, Timothy Oliver, demands damages against the defendant University of Miami , in an amount in excess of Fifty Thousand ($50,000.00) Dollars, special damages for lost career as result of not obtaining a doctorate degree including the salary he would have earned if plaintiff was conferred a doctorate, and other damages together with costs of suit and such other and further relief as this Court deems just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable as a matter of right.

Dated: Fort Lauderdale, Florida
June 8, 2023

                STEWART LEE KARLIN
                LAW GROUP, PC

                /s/ Stewart Lee Karlin

                STEWART LEE KARLIN, ESQ
                Attorney for Plaintiff
                2003 W Cypress Creek Road, Suite 100
                Fort Lauderdale, FL 33309
                (212) 792-9670
                slk@stewartkarlin.com
                Florida Bar No. 0961159